WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Christopher Buck, | ) | No. CV 09-145-TUC-HCE |
| Plaintiff, | ) ) | **ORDER** |
| vs. | ) ) | |
| Michael J. Astrue, Commissioner of Social Security, | ) ) ) | |
| Defendant. | ) ) | |
| | ) | |

Plaintiff has filed the instant action seeking review of the final decision of the Commissioner of Social Security pursuant to 42 U.S.C. § 405(g). The Magistrate Judge has jurisdiction over this matter pursuant to the parties' consent. *See* 28 U.S.C. § 636(c).

Pending before the Court are Plaintiff's Opening Brief (Doc. No. 15) (hereinafter "Plaintiff's Brief"), Defendant's Opposition to Plaintiff's Opening Brief (Doc. No. 16) (hereinafter "Defendant's Opp."), and Plaintiff's "Response to Defendant's Opposition to Plaintiff's Opening Brief" (Doc. No. 17) (hereinafter "Reply"). For the following reasons, the Court remands this matter for further proceedings.

I.     PROCEDURAL HISTORY

On June 22, 2005, Plaintiff protectively filed with the Social Security Administration (hereinafter "SSA") an application for disability insurance benefits under Title II and Title XVI of the Social Security Act alleging inability to work since January 1, 2005 due to a gun

shot wound to the right leg. (TR 118, 210, 216, 345-48). Plaintiff's application was denied initially and on reconsideration. (TR. 60, 62, 89, 96, 309, 317).

Plaintiff then requested a hearing before an administrative law judge. (TR 302). The matter was set for hearing on January 24, 2007 before Administrative Law Judge (hereinafter "ALJ") Peter J. Baum. (TR. 338). Plaintiff failed to appear for the hearing at the scheduled time and the ALJ indicated that Plaintiff's counsel had two weeks within which to notify the ALJ why Plaintiff had failed to appear and whether Plaintiff wished to proceed, otherwise the matter would be dismissed. (TR. 341). The record reflects that Plaintiff eventually appeared for the hearing and explained to the ALJ that he had been delayed due to transportation issues. (TR. 59; *see also* TR. 58). Thereafter, the matter came on for hearing on March 28, 2007. (TR. 343-366). At the March 28, 2007 hearing Plaintiff and Kathleen McAlpine, a vocational expert, testified before the ALJ.[1] (*Id.*). On September 28, 2007, the ALJ denied Plaintiff's claim. (TR. 40-50). On January 9, 2009, the Appeals Council denied Plaintiff's request for review thereby rendering the ALJ's September 28, 2007 decision the final decision of the Commissioner. (TR. 4-7). Plaintiff then initiated the instant action.

## II.    THE RECORD ON APPEAL

### A.    Plaintiff's general background and Plaintiff's statements in the record

Plaintiff was born on July 15, 1963 and was 41 years old on his alleged disability date. (TR. 49, 350). At the time of the hearing, Plaintiff lived alone. (TR. 355).

Plaintiff attended school through the 12th grade and has a GED. (TR. 213, 350; *but see* TR. 322 (Plaintiff reported to Dr. Rastatter that he completed school through the 11th grade and subsequently obtained a GED)). He has had no vocational training. (TR. 214). From 1988 to 2004, and for approximately one month in 2005, Plaintiff worked as a technician installing window film. (TR. 202, 211). Plaintiff's work involved cutting, shaping and heat shrinking window film, crawling in and out of cars, lifting glass, walking,

_____

[1]Plaintiff's counsel declined the opportunity to question Plaintiff at the hearing. (TR. 361).

standing, climbing, kneeling, crouching, crawling, handling large and small objects, and reaching. (TR. 203). He frequently lifted up to 25 pounds and sometimes lifted 100 pounds or more. (*Id.*). He has also supervised up to five employees. (*Id.*).

Plaintiff suffered a gunshot wound to his right foot in 1981 and two of his toes were amputated. (TR. 178, 214, 277, 280). Plaintiff stated in his disability application that the pain in his right leg makes him limp and renders him unable to "move fast enough to complete work." (TR. 211; *see also* TR. 214 ("I have a gun shot on my right leg that happened on [sic] 1981. The pain is to [sic]] much to handle when I work.")). In July 2005, Plaintiff's daily activities included waking before 8:00 a.m. and taking 3 Advil for pain. (TR. 194). He must sit in a chair for thirty minutes to one hour until the pain decreases so that he "can walk around for a few minutes." (*Id.*). He experienced pain during the night caused from swelling of his right foot. (TR. 195). He reported difficulty standing on one leg to put on pants and standing in the shower. (*Id.*). He prepared his own meals, did his own laundry and brief sweeping. (TR. 196). He spent his time building models, reading and watching television. (TR. 198). He reported that his condition affected his ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, complete tasks and concentrate. (TR. 199). He estimated that he could walk up to 50 feet before needing to stop and rest. (*Id.* (also stating that he could "walk small distances before swelling occurs, and I have to sit because of extreme pain.")). Plaintiff also reported that he used crutches or a cane if he stood for more than one hour but no doctor had prescribed this. (TR. 200). He does not handle stress or change in his routine well and he is "irritable and short tempered and very stressed out." (*Id.*).

In his December 2005 Disability Report on appeal, Plaintiff stated that the pain in his right foot was progressively worsening, each step was painful, and pain medication did not help. (TR. 177). He was unable to stand for more than a few minutes. (*Id.*). Additionally, his right leg swells due to poor circulation "because of my mutilated right foot, amputated toes and loss of arteries makes me get severe dizzy spells which limits my ability to drive, I fear I might pass out and hurt myself." (TR. 178). Plaintiff also has difficulty controlling his anger and experiences mood swings. (TR. 177). He has outbursts of violent behavior,

he verbally abuses those around him, and breaks things. (*Id.*). He also experiences headaches and insomnia. (*Id.*). In December 2005, Plaintiff was taking Advil and stated that he did not take prescription pain medication because he did not "like feeling...incoherent." (TR. 183). By the end of the day, he feels like he is walking on razor blades and has to hop on one leg to get to his bed. (TR. 184).

In his March 2006 Disability Report-Appeal, Plaintiff stated that his right foot was deteriorating and "becoming more fragile...," his leg muscles were in atrophy and both legs were gradually getting weaker. (TR. 158). The pain from his right foot made it difficult for him to focus on anything. (*Id.*). He also stated that he has arthritis in his hands. (TR. 160). At that time, Plaintiff was taking Oxycodone/Percocet and Lyrica. (TR. 161).

Plaintiff testified that he is able to stand for only five minutes, he can sit for only about 10 minutes and then his leg becomes numb. (TR. 357). When Plaintiff goes grocery shopping, he uses the cart as a walker and can shop for up to 15 minutes before needing to sit down. (TR. 358). Plaintiff does not drive because his driver's license is suspended. (TR. 356). He can control the gas and brake pedals. (*Id.*).

He passes time at home by doing chores such as sweeping, cleaning dishes, and going back and forth from his garage. (TR. 358-59). He sweeps three times a day for about two to three minutes at a time. (TR. 359).

Plaintiff testified that he suffers from poor circulation and dizziness. (TR. 356-57 ("when I stand up to leave this room, I'm probably going to get dizzy....")).

B.    Medical Evidence Before the ALJ

1.    Examining Sources

a.    Physical Impairment

August 11, 2005 x-rays revealed "multiple metallic foreign bodies consistent with shotgun pellets" in Plaintiff's right foot. (TR. 280). Plaintiff's second and third toes had been amputated and the fourth showed "post fracture deformity distally which appears healed." (*Id.*). Additionally, the first digit showed a moderately severe hallux valgus deformity. (*Id.*). There was no evidence of osteolytic destruction or other acute process.

(*Id.*).

On August 11, 2005, Plaintiff presented to Jerome Rothbaum, M.D., for a disability evaluation. (TR. 277). Plaintiff reported to Dr. Rothbaum that he had received a gunshot wound to the right foot when he was 18 years of age. (*Id.*). Thereafter, Plaintiff underwent several surgeries, including plastic surgery, on his right foot due to the wound. (*Id.*). Plaintiff had not had any surgeries to his foot in the past 20 years. (*Id.*). Plaintiff told Dr. Rothbaum that he had difficulty running and that "[w]alking has become somewhat of a problem." (Id.). If Plaintiff "pads his foot with...four socks and wears shoes, he really is not too much limited." (*Id.*). Plaintiff was not taking any medications on a regular basis and did not use an assistive device. (TR. 278, 282). Plaintiff also told Dr. Rothbaum that he drives, lives by himself, is self-sufficient, and makes model cars out of wood as a hobby. (TR. 277).

Dr. Rothbaum also noted that Plaintiff suffered a gunshot wound to the abdomen sometime prior to when he sustained the shot to the right foot. (*Id.*).

On physical examination, Dr. Rothbaum found Plaintiff had lost his right third and fourth toes and there was "a moderate hallux valgus deformity of the right great toe. On examining the foot and the right leg in general, he complains and pulls away stating that it produces generalized pain in the leg and certainly in a nonanatomic fashion and he will also say it is really not very bad." (TR. 278). Although Plaintiff walked with a slight antalgic gait, limping on the right foot, when he was in Dr. Rothbaum's office, "he was observed in the parking lot with issues on walking without difficulty." (*Id.*).

Dr. Rothbaum found that Plaintiff was "anxious and somewhat inappropriate with very unusual overall affect. Recall is appropriate." (*Id.*).

Dr. Rothbaum's impression was:

1.     Anxiety. I would also question whether this individual does have more
        substantial psychological issues.
2.     Status post gunshot wound, right foot stable.
3.     Status post gunshot wound, abdomen, stable.

(*Id.*).

On August 11, 2005, Dr. Rothbaum completed a Medical Source Statement of Ability

To Do Work-Related Activities (Physical) wherein he indicated that Plaintiff: could occasionally lift up to 50 pounds and frequently lift up to 25 pounds; could stand and/or walk 6-8 hours in an 8 hour workday; had no limitations with regard to sitting, reaching, handling, fingering, feeling, and gripping; could frequently[2] climb, balance, stoop, kneel, crouch and crawl; and was restricted when working around heights and moving machinery. (TR. 281-282).

On January 9, 2006, Plaintiff presented to Genifer Chavez, M.D., for a disability evaluation. (TR. 236). Plaintiff complained of sharp pain in his right leg when walking, numbness and tingling, and inability to stand for very long. (*Id.*). He also complained of headaches and dizziness. (*Id.*). He was not taking any medication. (*Id.*).

On examination, Dr. Chavez found that Plaintiff had an antalgic gait. (TR. 237). He cushioned his foot with four or five socks and used a well-supported boot. (*Id.*). He was unable to heel and toe walk, and tandem walk, hop or squat. (*Id.*). Dr. Chavez indicated that Plaintiff had "[d]ecreased right ankle range of movement, virtually on all planes. Right foot atrophy, mid-forefoot or soft tissue and bony loss, evidence of a through-and-through gunshot wound, amputation of second and third toes, moderate hallux valgus right great toe, evidence of palpable shotgun pellets on dorsum of right foot, and calluses evident on plantar surfaces." (TR. 238). Dr. Chavez also found on physical examination that Plaintiff had "[g]ood hand and finger movements." (TR. 237.).

Dr. Chavez concluded that Plaintiff "may tolerate sitting one half hour to one hour at a time, aggregate six hours in an eight-hour day. He may tolerate standing and walking 15 minutes at a time, aggregate four hours in an eight-hour workday. He may have difficulty standing and lifting even 20 pounds of weight. He should not have difficulty with reaching, seeing, hearing and speaking. He may drive and travel about one half hour at a time." (TR. 238-39).

---

[2]In this context, "frequently" means "2-6 hours/day" as opposed to unrestricted, no more than 2 hours per day, or never. (TR. 282).

<u>b.     Mental Impairment</u>

On September 15, 2005, Plaintiff presented to Francisco A. Sanchez, Ph.D., Licensed Psychologist for a consultative psychological examination. (TR. 273-75). Plaintiff complained of leg pain and dizzy spells. (TR. 273). He stated that "'A cane would not do me any good.'" (*Id.*). He also reported that he became overwhelmed by small things because he felt confused and could not think clearly. (*Id.*). Plaintiff told Dr. Sanchez that he rode a motorcycle and did household chores but has to sit every five to ten minutes. (TR. 274). Dr. Sanchez noted: "[Plaintiff] does not have major restrictions of daily activities but does present as irritable, dysphoric and socially withdrawn." (*Id.*). Plaintiff denied a psychiatric history, depression or receiving medication or treatment for same. (TR. 273-74).

Dr. Sanchez found that although Plaintiff "seemed down and dysphoric...", he was alert and oriented and his speech remained coherent and goal-directed, his associations were logical and his recent and remote memory was consistent with average intelligence. (TR. 274). During administration of the Mini-Mental Status Examination, Plaintiff "seemed confused and had to stop and think about what he was supposed to do during parts of this exam. Nevertheless, he was accurate in his responses" and scored 29 out of 30 points. (*Id.*). "He responded correctly to orientation questions and spelled world backwards. However, he could not remember the word apple after a delay of time. He managed to repeat a simple sentence, followed and remembered a simple three-step instruction with hesitation and wrote a simple complete sentence." (TR. 274-75). During his appointment with Dr. Sanchez, Plaintiff was "mentally confused resulting in feeling overwhelmed and having difficulties with decision making." (TR. 274). Dr. Sanchez found that Plaintiff "presents as insecure, nervous, restless, mildly hyperactive, tearful and dysphoric."[3] (TR. 275). Dr. Sanchez's diagnosis included depression not otherwise specified, phase of life problem, and ADHD adult type, mild. (*Id.*). He opined that Plaintiff's "prognosis with psychiatric and

---

[3]Elsewhere in his report, Dr. Sanchez noted that Plaintiff presented "with mild to moderate hyperactivity." (TR. 273).

psychological treatment over the course of the next 12 months is fair." (*Id.*).

In a September 15, 2005 Medical Source Statement of Ability To Do Work Related Activities (Mental), Dr. Sanchez repeated his diagnoses of "Depression NOS; Phase of Life Problems; ADHD, Adult." (TR. 276). He opined that Plaintiff's conditions would not impose any limitations for 12 months. (*Id.*).

On January 6, 2006, Plaintiff presented to Hunter Yost, M.D., for a psychological evaluation. (TR. 254). Plaintiff complained about anger issues, mood swings and insomnia. (*Id.*). Plaintiff had not received treatment for mental health or medication for same. (*Id.*). Plaintiff stated that upon rising in the morning, he was unable to walk. (TR. 255). "Later, he will do some motorcycle and truck repair work, oil painting[] or reading. (*Id.*). Dr. Yost noted that Plaintiff's hands and fingernails were "soiled...as if he had been doing a lot of mechanical work, but had not washed." (*Id.*).

Dr. Yost observed that Plaintiff's mood was mildly depressed, he maintained good eye contact, and spoke coherently and fluently. (*Id.*). On the Mini-Mental Status Examination he scored 28 out of 30. (*Id.*). "There was no evidence of a thought disorder. There were no hallucinations or delusions." (*Id.*). Dr. Yost's diagnoses included depression not otherwise specified and caffeine dependence. (TR. 256). He determined Plaintiff's Global Assessment of Functioning (hereinafter "GAF") score was 50 to 55.[4] (*Id.*). Dr. Yost stated that Plaintiff,

---

[4]GAF Scores range from 1-100. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*, p.32 (4th ed.). In arriving at a GAF Score, the clinician considers psychological, social, and occupational functioning on a hypothetical continuum of mental health illness. *Id.* Physical and environmental factors are not included. *Id.* A GAF score between 41-50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Id.*(emphasis omitted). A GAF score of 51-60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *Id.* (emphasis omitted) "[C]ourts have specifically held that a GAF score does not directly correlate to disability." *Vose v. Astrue,* 2007 WL 4468720, *17 (D.Ariz. Dec.17, 2007) (citations omitted)).

"while not qualifying for a diagnosis of a major depressive disorder, is becoming increasingly frustrated about his physical limitations and his inability to do the type of work that he has done previously." (*Id.*) In a January 6, 2006 Medical Source Statement of Ability To Do Work Related Activities (Mental), Dr. Yost opined that Plaintiff was a "good candidate for vocational rehabilitation. There were some minor deficits on cognitive exam. However, I believe that he is able to manage benefits in his own behalf." (*Id.*). Dr. Yost opined that Plaintiff's condition would not impose any limitations for 12 months. (TR. 258).

### 2. Non-examining State Agency Physicians

#### a. Physical Impairments

On January 17, 2006, medical consultant Charles Fina completed a Physical Residual Functional Capacity Assessment wherein he indicated that Plaintiff could: occasionally lift up to 20 pounds and frequently lift up to 10 pounds; stand and/or walk about 6 hours in an 8-hour workday and sit about 6 hours in an 8-hour workday; frequently climb ramps and stairs, balance, stoop, kneel, crouch, and crawl but never climb ladders, ropes or scaffolds. (TR. 229-30). It was also noted that Plaintiff "was observed independently when unaware of said observation; he ambulated without difficulty and without discernible limp, but feigned a limp and refused to perform normally expected functions when examined. This latter observation was not given proper weight by the recent CE. Therefore I am compelled to follow the observed exam of the previous examiner re. [Plaintiff's]...capacity to walk." (TR. 229). Plaintiff was found "not credible based on the evaluation of the previous examiner." (TR. 233).

#### b. Mental Impairments

On January 14, 2005,[5] Hubert R. Estes, M.D., completed a Psychiatric Review

_____

[5]The Court questions the date of Dr. Estes' opinion given that Dr. Estes refers to two previous psychiatric consultative exams and summarizes that both examining doctors, like Dr. Sanchez on September 15, 2005 and Dr. Yost in January 6, 2006, diagnosed depression NOS and one, like Dr. Sanchez, also diagnosed ADHD. (TR. 252). Nevertheless, the exact date of Dr. Estes' opinion does not impact the analysis in Plaintiff's case.

- 9 -

Technique form wherein he indicated that Plaintiff's mental impairments, which he classified as Organic Mental Disorders–ADHD and Affective Disorder–Depressive disorder not otherwise specified, were not severe. (TR. 240). He indicated that Plaintiff: had no restrictions of activities of daily living; had mild difficulties in maintaining social functioning and maintaining concentration, persistence or pace; and had no episodes of decompensation. (TR. 250). Dr. Estes noted that "there is no evidence of significant limitation of function on a mental basis." (TR. 252).

On November 1, 2005, Alan L. Goldberg, Psy.D., completed a Psychiatric Review Technique form wherein he indicated that Plaintiff fell within the categories of organic mental disorder being ADHD and affective disorder being depression not otherwise specified but did not suffer from a severe impairment. (TR. 259-260, 262). Dr. Goldberg found that Plaintiff had no restriction of activities of daily living and mild difficulties in maintaining social functioning and maintaining concentration, persistence or pace. (TR. 269). Dr. Goldberg further indicated that Plaintiff

> was able to follow complex, multistep commands while affect and mood reflected a dysphoric state, he appears capable of sustaining basic work and complex work for which he has experience, training, education. Impairment non-severe.

(TR. 271).

### 3. Other Sources

On February 22, 2006, Dr. Rinly R. Gecosala,[6] M.D., M.P.H., completed a form wherein he checked boxes indicating that Plaintiff has a physical or mental incapacity which prevents him from performing any substantial gainful employment, and that Plaintiff has a medical impairment which is expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. (TR. 227). Preprinted

---

[6]The record suggests that Plaintiff's counsel submitted Dr. Gecosala's report. (*See* TR. 226-227). Yet, Plaintiff's Brief indicates that Dr. Gecosala's assessment was completed "at the request of the administration...." (Plaintiff's Reply, p. 5). The record does not reflect Dr. Gecosala's treatment relationship with Plaintiff.

language on the form states: "The person named above [i.e., Plaintiff] has informed us that he/she has one or more of the conditions marked below:..." (*Id.*) Thereafter, Dr. Gecosala has marked the boxes next to "Arthritis (Rheumatoid) with obvious deformities of hands, knees, etc." and "Amputation..." where "toes" has been written. (*Id.*). In August 2006, Dr. Gecosala completed a Physical Residual Functional Capacity Assessment wherein he indicated that Plaintiff: could stand, sit and walk without a formal break for less than one hour; could stand, sit and walk during an 8-hour workday with 3 formal breaks for less than 2 hours; was markedly limited in climbing and squatting; and was limited when working around heights, moving machinery, driving and operating machinery, and exposure to dust, fumes/gases and chemicals. (TR. 293). Dr. Gecosala also indicated that Plaintiff could lift and carry up to 20 pounds for less than 2 hours in an 8-hour workday and he could lift and carry less than 10 pounds for more than 2 hours during the workday. (*Id.*). Additionally, the limitations specified also included the requirement that Plaintiff lie down during the day. (*Id.*).

C. Vocational Expert Testimony

Kathleen McAlpine, vocational expert, testified at the March 28, 2007 hearing. Ms. McAlpine opined that Plaintiff's work installing window film required a medium exertional level and was semi-skilled work. (TR. 362). The ALJ posed the following hypothetical question regarding a man of Plaintiff's age and educational level and past work experience who

> may tolerate sitting one-half hour to one hour at a time, aggregate six hours in an eight hour day. He may tolerate standing and walking 15 minutes at a time, aggregate four hours in an eight-hour day. He may have difficulty standing and lifting even 20 pounds of weight...simultaneously. He should not have difficulty with reaching, seeing, hearing and speaking. He may drive about one-half hour at a time. If you assumed that set of limitations, am I correct in understanding he would be limited to mostly sedentary level of exertion?

(TR. 362-63). Ms. McAlpine replied: "Yes." (TR. 363). When the ALJ asked whether jobs existed in the regional or national economy which such a gentleman could sustain given the limitations specified, Ms. McAlpine responded that Plaintiff could work as a production assembler. (*Id.*). Ms. McAlpine acknowledged that the *Dictionary of Occupational Titles*

and the *Selected Characteristics of Occupations* does not address "being able to sit only for a half hour to one hour at a time, standing and walking 15 minutes at a time." (*Id.*). Therefore, she was unable to rely on the national publications to evaluate the specific functional activity with regard to sitting and standing limitations expressed in the hypothetical. (*Id.*). However, Ms. McAlpine was familiar with production assembler jobs as they are performed in Arizona, and she believed that as those jobs are performed in Arizona, a person of Plaintiff's age, education, work background and the limitations as specified by the ALJ, could sustain the job as a production assembler. (TR. 363-64). She also testified that 17,416 production assembler jobs exist in Arizona. (TR. 364).

The ALJ also asked Ms. McAlpine whether a person could sustain the production assembler job if such person was of Plaintiff's age and had Plaintiff's age and educational background but could "only be on his feet for five minutes at a time. With a walker, he can be on his feet 15 minutes at a time. He can only sit for 10 minutes at a time." (*Id.*) And such person had to alternate sitting and standing every five to 10 minutes." (*Id.*). Ms. McAlpine testified that she did not believe that this person could work as a production assembler. (*Id.*).

Plaintiff's counsel, referring to an evaluation of Plaintiff from "the Disability Clinic of Arizona...", asked Ms. McAlpine whether,

> if in addition to the hypothetical number two and number one proposed by the judge, if in addition to those observation [sic], he is suffering obviously as you have actually witnessed from ADHD, that he has a very slow to learn require task, that he lost track of work process, that he is suffering from increased [INAUDIBLE] confusion and increased emotional stress and could not remain standing after approximately five minutes, if you add those observations, any observations you may have had, would he be able to do the production job?

(TR. 364-65) (inaudible indication in original). Ms. McAlpine responded: "Using hypothetical two no and one, no." (TR. 365).

D.    The ALJ's Findings

1.    Claim Evaluation

SSA regulations require the ALJ to evaluate disability claims pursuant to a five-step sequential process. 20 C.F.R. §§404.1520, 416.920; *Baxter v. Sullivan,* 923 F.2d 1391, 1395 (9th Cir. 1991). The first step requires a determination of whether the claimant is engaged

in substantial gainful activity.  20 C.F.R. §§ 404.1520(b), 416.920(b).  If so, then the claimant is not disabled under the Act and benefits are denied.  *Id.*  If the claimant is not engaged in substantial gainful activity, the ALJ then proceeds to step two which requires a determination of whether the claimant has a medically severe impairment or combination of impairments.  20 C.F.R. §§ 404.1520(c), 416.920(c).  In making a determination at step two, the ALJ uses medical evidence to consider whether the claimant's impairment more than minimally limited or restricted his or her physical or mental ability to do basic work activities.  *Id.*  If the ALJ concludes that the impairment is not severe, the claim is denied. *Id*.  If the ALJ makes a finding of severity, the ALJ proceeds to step three which requires a determination of whether the impairment meets or equals one of several listed impairments that the Commissioner acknowledges are so severe as to preclude substantial gainful activity. 20 C.F.R. §§ 404.1520(d), 416.920(d); 20 C.F.R. Pt. 404, Subpt. P, App.1.  If the claimant's impairment meets or equals one of the listed impairments, then the claimant is presumed to be disabled and no further inquiry is necessary.   If a decision cannot be made based on the claimant's then current work activity or on medical facts alone because the claimant's impairment does not meet or equal a listed impairment, then evaluation proceeds to the fourth step.  The fourth step requires the ALJ to consider whether the claimant has sufficient residual functional capacity (hereinafter "RFC")[7] to perform past work.    20 C.F.R. §§ 404.1520(e), 416.920(e).  If the ALJ concludes that the claimant has RFC to perform past work, then the claim is denied.  *Id*.  However, if the claimant cannot perform any past work due to a severe impairment, then the ALJ must move to the fifth step, which requires consideration of the claimant's RFC to perform other substantial gainful work in the national economy in view of claimant's age, education, and work experience.   20 C.F.R. §§ 404.1520(f). 416.920(f).  At step five, in determining whether the claimant retained the ability to perform other work, the ALJ may refer to Medical Vocational Guidelines

---

[7]Residual functional capacity is defined as that which an individual can still do despite his or her limitations.  20 CFR §§ 404.1545, 416.945.

(hereinafter "grids") promulgated by the SSA. *Desrosiers v. Secretary,* 846 F.2d 573, 576-577 (9th Cir. 1988). The grids are a valid basis for denying claims where they accurately describe the claimant's abilities and limitations. *Heckler v. Campbell,* 461 U.S. 458, 462, n.5 (1983). However, because the grids are based on exertional or strength factors, where the claimant has significant nonexertional limitations, the grids do not apply. *Penny v. Sullivan,* 2 F.3d 953, 958-959 (9th Cir. 1993); *Reddick v. Chater,* 157 F.3d 715, 729 (9th Cir. 1998). Where the grids do not apply, the ALJ must use a vocational expert in making a determination at step five. *Desrosiers,* 846 F.2d at 580.

<u>2.    The ALJ's Decision</u>

In his September 28, 2007 decision, the ALJ made the following findings:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2007.

2.    The claimant has not engaged in substantial gainful activity since January 1, 2005, the alleged onset date (20 CFR 404.1520(b), 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.*).

\*\*\*

3.    The claimant has the following severe combination of impairments: status post gunshot wound to right leg with amputation times two; depression (20 CFR 404.1520(c) and 416.920(c)).

\*\*\*

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

\*\*\*

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to sit one half our to one hour at a time, aggregated six hours in an 8-hour day; he may tolerate standing and walking 15 minutes at a time, aggregate four hours in an 8-hour day; he may have difficulty standing and lifting 20 pounds.

\*\*\*

6.    The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

***

7.      The claimant was born on July 15, 1963 and was 41 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. (20 CFR 404.1563 and 416.963).

8.      The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR 404, Subpart P, Appendix 2).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the regional economy that the claimant can perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).

***

11.     The claimant has not been under a disability, as defined in the Social Security Act, from January 1, 2005 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

## DECISION

Based on the application for a period of disability and disability insurance benefits protectively filed on June 22, 2005, the claimant is not disabled under section 216(i) and 223(d) of the Social Security Act.

Based on the application for supplemental security income protectively filed on June 22, 2005, the claimant is not disabled under section 1614(a)(3)(A) of the Social Security Act.

(TR. 43-50)

In reaching his decision, the ALJ considered "the effect of..." Plaintiff's mental impairment even though such impairment was not severe. (TR. 47 ("While the claimant's mental impairment in [sic] non-severe, the undersigned has considered the effect of this impairment in reaching the disability decision.")).  He also gave "significant weight to opinions of the State agency medical consultants, specifically..." medical source statements provided by Dr. Chavez and Dr. Estes.  (TR. 48).  The ALJ discounted Dr. Gecosala's "meager opinion..." because that opinion provided no basis for concluding that Plaintiff was

disabled, was "conclusory and unsubstantiated by relevant medical documentation[,]...is inconsistent with the results of two consultative examinations and does not take into account credible evidence that the claimant exaggerates his symptoms." (*Id.*). The ALJ also noted that although, in the pre-hearing memorandum, Plaintiff's counsel cited to "reports provided by the University of Arizona disability center[,]...these reports have not been submitted into evidence." (*Id.*).

The ALJ found that although Plaintiff's "medically determinable impairments could reasonably be expected to produce the alleged symptoms,..." the ALJ did not find "entirely credible" Plaintiff's statements concerning the intensity, persistence, and limiting effects of these symptoms. (*Id.*). To support this finding, the ALJ stated that Plaintiff's allegations of disabling symptoms were unsupported by the medical evidence. (*Id.*). The ALJ also pointed out that

> [a]fter the date [Plaintiff] alleges he became disabled, he told the Arizona Department of Economic Security, under penalty of law, that he had no physical condition or handicap which would limit his ability to work full time, and that there was no reason he could not accept full-time work....In fact, the claimant did work full time. Moreover, there is evidence that the claimant exaggerates his symptoms. In the first consultative examiner's office, the claimant feigned a limp and refused to perform normally expected functions when examined. Yet when he was unaware he was being observed, he walked without difficulty.

(*Id.*). The ALJ further cited the fact that Plaintiff has had no regular treatment for his allegedly debilitating foot pain: "If his condition was not severe enough to motivate him to seek treatment, particularly when treatment is available, it is difficult to accept his assertion that it is disabling." (*Id.*).

E.     Proceedings Before the Appeals Council

The Appeals Council indicated that it had received a March 17, 2006 Psycho-Social Assessment from Charles J. Rastatter, Ed.D., which the Appeals Council made part of the record. (TR. 7).

1.     Dr. Rastatter's Assessment

In February and March 2006, Plaintiff underwent a Psycho-Social Assessment

performed by Charles J. Rastatter, Ed. D., Director, Vocational Assessment,[8] who issued a report on March 17, 2006. (TR. 322). The purpose of the assessment was to determine Plaintiff's potential to return to work in the competitive labor market. (*Id.*). Plaintiff "presented himself as an extremely anxious, depressed, distraught, confused, yet generally very friendly and cooperative...." (*Id.*). Dr. Rastatter noted inconsistencies in Plaintiff's presentation of his educational and work background, and opined "that such inconsistencies are more a function of [Plaintiff's]...current problems related to his almost complete concentration and focus on his leg and foot pain to the exclusion of almost everything else. He was observed throughout the 6-hour evaluation process to be generally unable to think about or talk about anything but that pain and its affect on every aspect of his life." (*Id.*).

Dr. Rastatter observed that Plaintiff had "significant problems walking, standing, [and] sitting..." due to leg and foot pain. (TR. 323). Plaintiff also demonstrated problems with balance when walking or standing. (*Id.*) "He was unable to sustain even minimal lower extremity physical activity for more than 5 - 10 minutes, requiring rest periods during and at the conclusion of tasks." (*Id.*).

Plaintiff also had difficulty using his upper extremities as well. (*Id.*). He had problems with reaching, handling, fingering, and feeling causing him to have difficulty picking up and holding small pins and other objects which he frequently dropped. (*Id.*). He had problems manipulating screws, switches, buttons with his fingers; instead he often used his palms to manipulate switches. (*Id.*). "He was unable to sustain upper extremity physical efforts for more than 5 to 10 minutes" and required rest periods. (*Id.*).

Plaintiff's "neuropsychological screening results and interpretations were reviewed and validated by Dr. Donald R. Ross, Ed.D., Director, Psychosocial Assessment, Arizona

---

[8]In his brief, Plaintiff states that Dr. Rastatter is the "Director, Vocational Assessment of the University of Arizona Disability Assessment Research Clinic...." (Plaintiff's Brief, p.6). Plaintiff asserts that he timely submitted Dr. Rastatter's report to the ALJ. (*Id.*, p. 2; *see also* TR. 10 ("we did provide this document to the ALJ....The ALJ did not ask us either at the hearing or after the hearing to provide him with the allegedly missing document.")).

Licensed Psychologist...." (TR. 324). Plaintiff's performance on the "Comprehensive Trail-Making Test"[9] placed him in "the Mildly to Moderately Impaired classification" for 4 of 5 trails. (TR. 325). He fell within the Severely Impaired classification on one trail. (*Id.*). Plaintiff's overall performance of the Stroop Color and Word Test[10] "was very slow, deliberate, methodical, punctuated with numerous errors. He demonstrated increased anxiety, frustration combined with some loss of concentration and focus on task as the exercises progressed." (TR. 325-26). Dr. Rastatter opined that the results of the neuropsychological screening indicated "the existence of psychological and cognitive problems. [Plaintiff]...demonstrates general cognitive confusion and the likelihood of a cognitive disorder, inability to sustain concentration, increased frustration and anger related to inability to perform tasks as he feels he can or should, general depressive symptoms, significant problems learning and remembering new information, obsession with current pain and weakness in legs and foot and numerous other body parts to the exclusion of any logical thought of the lack of evidence for the existence of such pain and/or weakness." (TR. 326).

Cognitive testing reflected that Plaintiff had a low-average level of reasoning and general intelligence. (TR. 327). On the Wechsler Adult Intelligence Scale-WAIS III, Plaintiff fell in the borderline area with regard to picture completion and digit symbol-coding which, according to Dr. Rastatter, indicated "significant cognitive performance weaknesses in the areas of attention to detail and visual recognition of objects, accuracy and speed of visual motor coordination and scanning ability." (TR. 327-28). Other cognitive testing[11] showed Plaintiff fell within 6th to 7th grade equivalencies in reasoning, reading, and math. (TR. 328-29). Dr. Rastatter opined that the results were lower than expected for someone

---

[9]The Comprehensive Trail-Making Test "is generally used for the purposes of detecting brain compromise..., problems with psychomotor speed, visual search and sequencing and attention." (TR. 325).

[10]The Stroop test "measures the basic neuropsychological interference in verbal processing." (TR. 325).

[11]Tests of Adult Basic Education. (TR. 328-239).

with Plaintiff's work and educational history.  (TR. 327, 329).

On testing of physical performance, Plaintiff performed tasks "very laboriously and with numerous errors" reporting increased pain and fatigue while his pace slowed as the exercises progressed.  (TR. 329). Plaintiff walked with an antalgic gait, demonstrated "slight balance problems" and fell into the below-competitive-work performance level with regard to climbing and descending stairs.  (TR. 330).  Plaintiff was unable to complete testing that involved stooping, kneeling, and crouching.  (TR. 331).  Dr. Rastatter found that:

> With minimally repetitive, prolonged physical activity requiring only minimal cognitive performance, Mr. Buck demonstrates extreme physical and emotional responses, reporting high level pain and fatigue, demonstrating increased problems related to concentration, focus, learning, memory.  Based on all elements of the P[hysical] C[apacities] E[valuation], it is the evaluator's opinion that [Plaintiff]...would be best served in a Sedentary Work situation modified to accommodate the problems listed above.

(TR. 331).

Dr. Rastatter concluded that Plaintiff could not return to his previous work and that Plaintiff "would not be able to perform successfully in any employment situation on a regular and/or part-time basis."  (TR. 332-33).  Nor would Plaintiff be able to perform successfully in any training situation.  (TR. 333).

### 2.    The Appeals Council's Decision

On January 9, 2009, the Appeals Council issued its decision denying Plaintiff's request for review.  (TR. 4-7).   The Appeals Council indicated that it would review a case if: (1) the ALJ appears to have abused his or her discretion; (2) there is an error of law; (3) the decision is not supported by substantial evidence; (4) there is a broad policy or procedural issue that may affect public interest; or (5) "[w]e receive new and material evidence and the decision is contrary to the weight of all of the evidence now in the record."  (TR. 4); *see also* 20 C.F.R. §404.970.  Upon consideration of Plaintiff's argument and Dr. Rastatter's March 17, 2006 report, the Appeals Council "found that this information does not provide a basis for changing the Administrative Law Judge's decision."  (TR. 4-5, 7).

III.    DISCUSSION

A.    Argument

Plaintiff argues that the Appeals Council erred when it failed to give weight to Dr. Rastatter's report and/or to remand the matter to the ALJ for consideration of that report. According to Plaintiff, "failure of the Appeals Council to review the additional evidence..." was not harmless because "the remaining medical evidence does not support mental limitations" and because the findings in Dr. Rastatter's report are supported by evidence from Dr. Yost and Dr. Sanchez. (Plaintiff's Reply, p.1). Plaintiff also argues that "mental testing is essential in determining psychological limitations." (Plaintiff's Brief, p. 2). Plaintiff's argument focuses entirely on that aspect of Dr. Rastatter's report relating to Plaintiff's allegations of mental impairment and or alleged symptoms associated with same.

Defendant asserts that Plaintiff's claim was properly denied. According to Defendant, substantial evidence supports the ALJ's decision that Plaintiff could perform a limited range of sedentary work. Defendant also points out that Dr. Rastatter is not an acceptable medical source and, thus, neither the ALJ nor the Appeals Council was required to accept or specifically reject such evidence. Defendant also contends that the record contains a number of bases for discounting Dr. Rastatter's assessment. Defendant further argue that any error with regard to Dr. Rastatter's report is harmless.

B.    Standard of Review

An individual is entitled to disability insurance benefits if he or she meets certain eligibility requirements and demonstrates the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 423, 1382. "'A claimant will be found disabled only if the impairment is so severe that, considering age, education, and work experience, that person cannot engage in any other kind of substantial gainful work which exists in the national economy.'" *Penny,* 2 F.3d at 956 (*quoting Marcia v. Sullivan,* 900 F.2d 172, 174 (9th Cir. 1990)).

To establish a *prima facie* case of disability, the claimant must demonstrate an inability to perform his or her former work. *Gallant v. Heckler*, 753 F.2d 1450, 1452 (9th Cir. 1984). Once the claimant meets that burden, the Commissioner must come forward with substantial evidence establishing that the claimant is not disabled. *Fife v. Heckler*, 767 F.2d 1427, 1429 (9th Cir. 1985).

The findings of the Commissioner are conclusive and courts may overturn the decision to deny benefits "only if it is not supported by substantial evidence or it is based on legal error." *Matney v. Sullivan,* 981 F.2d 1016, 1019 (9th Cir. 1992)(citations omitted). Therefore, the Commissioner's determination that a claimant is not disabled must be upheld if the Commissioner applied the proper legal standards and if the record as a whole contains substantial evidence to support the decision. *Clem v. Sullivan*, 894 F.2d 328, 330 (9th Cir. 1990) (citing *Desrosiers*, 846 F.2d at 575-76; *Delgado v. Heckler*, 722 F.2d 570, 572 (9th Cir. 1983)). Substantial evidence is defined as such relevant evidence which a reasonable mind might accept as adequate to support a conclusion. *Jamerson v. Chater,* 112 F.3d 1064, 1067-68 (9th Cir. 1997); *Winans v. Bowen,* 853 F.2d 643, 644 (9th Cir. 1988). However, substantial evidence is less than a preponderance. *Matney,* 981 F.2d at 1019.

The Commissioner, not the court, is charged with the duty to weigh the evidence, resolve material conflicts in the evidence and determine the case accordingly. *Id.* However, when applying the substantial evidence standard, the court should not mechanically accept the Commissioner's findings but should review the record critically and thoroughly. *Day v. Weinberger*, 522 F.2d 1154 (9th Cir. 1975). Reviewing courts must consider the evidence that supports as well as detracts from the examiner's conclusion. *Id.* at 1156.

In evaluating evidence to determine whether a claimant is disabled, the opinions of treating physicians are entitled to great weight. *Magallanes v. Bowen,* 881 F.2d 747, 751 (9th Cir. 1989). However, even a treating physician's opinion is not necessarily conclusive on either the issue of a physical condition or the ultimate issue of disability. *Id.* When resolving a conflict between the opinion of a treating physician and that of an examining or non-examining physician, the opinion of the treating physician is entitled to greater weight and

may be rejected only on the basis of findings setting forth specific legitimate reasons based on substantial evidence of record. *Magallanes,* 881 F.2d at 751. Moreover, the Commissioner may reject the treating physician's uncontradicted opinion as long as the Commissioner sets forth clear and convincing reasons for doing so. *Magallanes*, 881 F.2d at 751.

Further, when medical reports are inconclusive, questions of credibility and resolution of conflicts in the testimony are functions solely of the Commissioner. *Magallanes,* 881 F.2d at 751 (citations omitted). However, the Commissioner's finding that a claimant is less than credible must have some support in the record. *See Light v. Social Security Administration,* 119 F.3d 789 (9th Cir. 1997); *Connett v. Barnhart,* 340 F.3d 871 (9th Cir. 2003).

## C.    Analysis

Plaintiff requests that the Court "remand this case and...require that an additional mental consultative evaluation be performed to comment on the test results provided by the D[isability] A[ssessment] R[esearch] C[linic]."  (Reply, p. 1).

### 1.    Whether this Court may consider Dr. Rastatter's Report

Applicable regulations provide that the Appeals Council will review a case if: the ALJ appears to have abused his or her discretion; there is an error of law; the decision is not supported by substantial evidence; there is a broad policy or procedural issue that may affect public interest; or the Appeals Council receives new and material evidence and the ALJ's decision is contrary to the weight of evidence currently of record. 20 C.F.R. §404.970 (a)-(b). Specifically with regard to new evidence, the regulation provides:

> If new and material evidence is submitted, the Appeals Council shall consider the additional evidence only where it relates to the period on or before the date of the administrative law judge hearing decision.  The Appeals Council shall evaluate the entire record including the new and material evidence submitted if it relates to the period on or before the date of the administrative law judge hearing decision.  It will then review the case if it finds that the administrative law judge's action, findings, or conclusion is contrary to the weight of the evidence currently of record.

20 C.F.R. §404.970(b).  The Appeals Council was clear that it considered Dr. Rastatter's

report but found that there was no reason for changing the ALJ's decision.[12]  (*See* TR.4-5,
7).  Because the Appeals Council considered Dr. Rastatter's report, this Court may consider
that report on review.  *See Lingenfelter v. Astrue,* 504 F.3d 1028, 1030 n.2 (9th Cir. 2007);
(considering on appeal both the ALJ's decision and the additional material submitted to the
Appeals Council); *Harman v. Apfel,* 211 F.3d 1172, 1180 (9th Cir. 2000) (recognizing that
"[w]e properly may consider the additional materials because the Appeals Council addressed
them in the context of denying Appellant's request for review" and remanding for further
proceedings); *Ramirez v. Shalala,* 8 F.3d 1449, 1452 (9th Cir. 1449, 1452 ("we consider on
appeal both the ALJ's decision and the additional material submitted to the Appeals
Council.").

### 2.    Whether remand is appropriate

Plaintiff's Brief filed with this Court states that "[p]rior to the hearing, Plaintiff
enrolled in the state's vocational rehabilitation service in an attempt to secure a job which
meets his limitations.  The vocational services sent him to the Disability Assessment
Research Clinic...of the University of Arizona for testing of Plaintiff's ability to work."
(Plaintiff's Brief, p. 2).  As part of that evaluation, Dr. Rastatter completed a Psycho-Social

---

[12]Defendants point out that the Appeals Council will only consider new evidence that
is material.  (Defendant's Opp., p. 16 (*citing* 20 C.F.R. §404.970(b))).  Defendant defines
"material" in this instance to mean that "the claimant must demonstrate that there is a
reasonable possibility that the new evidence would have changed the outcome of the
administrative hearing."  (*Id.* (*quoting Mayes v. Massanari*, 276 F.3d 453, 462 (9th Cir.
2001))).  In this case, the Appeals Council stated that it *did consider* Dr. Rastatter's report
but nonetheless found no reason to disturb the ALJ's decision.  It follows that the Appeals
Council's decision to consider Dr. Rastatter's report necessarily required the Appeals
Council's initial determination that the report was "material."  *See* 20 C.F.R. §404.970(b).
Moreover, as set out *infra*, at III.C.2., Dr. Rastatter's opinions are "material" to the issue of
how Plaintiff's alleged mental impairment may affect his ability to work.  Additionally,
Defendant has not argued that Plaintiff must satisfy a good cause requirement for having
failed to submit the new evidence earlier, nor has Defendant argued that Plaintiff would fail
to meet such a standard if required.  *See Mayes,* 276 F.3d at 461 n.3 (avoiding determination
of whether a plaintiff must show good cause for submission of new evidence to the Appeals
Council)).

Assessment. (TR. 102, 322-336).

Defendant asserts that Dr. Rastatter is not considered an acceptable medical source because he possesses a doctor of education degree and does not appear to be a licensed physician or licensed psychologist. Defendant argues that although a claimant may offer evidence from sources other than acceptable medical sources in support of a claim, "Ninth Circuit precedent does not require that an ALJ accept or specifically refute such evidence." (Defendant's Opp., p.2). Plaintiff does not dispute Dr. Rastatter's credentials.

"The Code of Federal Regulations distinguishes between those opinions coming from 'acceptable medical sources' and those coming from 'other sources.'" *Gomez v. Chater,* 74 F.3d 967, 970 (9th Cir. 1996) (*citing* 20 C.F.R. §§404.1513(a) and (e), 416.913(a) and (e)). The regulations specifically identify licensed physicians and licensed or certified psychologists, *inter alia,* as "[a]cceptable medical sources...." 20 C.F.R. §§404.1513(a), 416.913(a)). The regulations further set out guidelines for the Commissioner to follow when weighing conflicting opinions from acceptable medical sources. *See Gomez,* 74 F.3d at 970 (*citing* 20 C.F.R. §§404.1527, 416.927).

In addition to considering evidence from the acceptable medical sources identified in the regulations, the ALJ may also consider evidence from "other sources to show the severity of [the claimant's]...impairment(s) and how it affects [the claimant's]...ability to work ." 20 C.F.R. §§404.1513(d), 416.913(d). "Other sources" include medical sources not listed as acceptable medical sources such as nurse's assistants, chiropractors, naturopaths and therapists; educational personnel such as school teachers and daycare workers; public and private social welfare agency personnel; and "[o]ther non-medical sources..." such as relatives, other caregivers, neighbors, and clergy. 20 C.F.R. §§404.1513(d)(1)-(4), 416.913(d)(1)-(4). The regulations "provide no specific guidelines for the weighing of opinions from other sources. This permits the Commissioner to accord opinions from other sources less weight than opinions from acceptable medical sources." *Gomez,* 74 F.3d at 970-71.

Review of Dr. Rastatter's report reflects that "a brief neuropsychological screening

- 24 -

evaluation was conducted..." and that "neuropsychological screening results and interpretations were reviewed and validated by Dr. Donald R. Ross, Ed.D., Director, Psychosocial Assessment, Arizona Licensed Psychologist #341." (TR. 324). When considering evidence from an "other source" who is working as part of a team with an acceptable medical source, the Ninth Circuit has held that the other source's opinions were properly considered as part of the opinion of the acceptable medical source. *Gomez,* 74 F.3d at 971 (relying, in part, on 20 C.F.R. § 416.913(a)(6)[13] to conclude that a nurse practitioner, who is identified as an "other source" under the regulations, working as part of an interdisciplinary team with a medical doctor constituted an acceptable medical source). In *Gomez,* the nurse practitioner at issue worked closely under the supervision of the doctor and she was acting as his agent in her relationship with the claimant. Further, since *Gomez* was decided, section 416.913(a)(6) has been deleted because "[i]t does not matter whether the evaluation by an acceptable medical source...is included in an interdisciplinary team report or is contained in a separate report. Because acceptable medical sources are individuals, it is redundant and somewhat misleading to provide that an interdisciplinary team report containing the evaluation and signature of an acceptable medical source is such a source." 65 Fed.Reg. at 34952. Dr. Rastatter's report does not contain an evaluation from Dr. Ross and there is no indication that Dr. Rastatter was merely acting as Dr. Ross' agent with regard to Plaintiff. Moreover, Plaintiff has not argued that Dr. Rastatter qualifies as an acceptable medical source or that any portion of his report constitutes evidence from an acceptable medical source.

In sum, Dr. Rastatter's opinion constitutes lay evidence. Because evidence from non-acceptable medical sources or lay witnesses "as to a claimant's symptoms is competent

---

[13]When *Gomez* was decided, section 416.913(a)(6) provided that "'[a] report of an interdisciplinary team that contains the evaluation and signature of an acceptable medical source is also considered acceptable medical evidence....'" *Gomez,* 74 F.3d at 971 (*quoting* 20 C.F.R. §416.913(a)(6), *deleted* as discussed in 65 Fed.Reg. 34950-01, 34952 (June 1, 2000)).

evidence that an ALJ must take into account..." , an ALJ commits legal error "unless he or she expressly determines to disregard such testimony and gives reasons germane to each witness for doing so." *Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir. 2001); *see also Dodrill v. Shalala*, 12 F.3d 915, 918-919 (9th Cir. 1993) (same).  Plaintiff, through his brief filed prior to the ALJ's decision, referred to Dr. Rastatter's report and appears to have included portions of Dr. Rastatter's report virtually verbatim.  (*See* TR. 102-114).  Plaintiff also asserts that he submitted Dr. Rastatter's report to the ALJ.  (TR. 102; Plaintiff's Reply, p.2).  However, the ALJ stated that he did not consider Dr. Rastatter's opinion because the report itself had "not been submitted into evidence."  (TR. 48).  Although the Appeals Council considered Dr. Rastatter's report, the Appeals Council concluded, without detailed discussion, that Dr. Rastatter's report did not provide a basis to change the ALJ's opinion.  (TR. 47-8).

Dr. Rastatter's report sets forth Dr. Rastatter's review of Plaintiff's medical history.  (TR. 322-24).  Dr. Rastatter noted SSA examining Dr. Yost's opinion that although Plaintiff did not qualify "for a diagnosis of major depressive disorder, [he] is becoming increasingly frustrated about his physical limitations and his inability to do the type of work that he has done previously."  (TR. 323-24).  Disagreeing with Dr. Yost's statement, Dr. Rastatter opined that Plaintiff "is probably experiencing something more than increased frustration."  (TR. 324).  Dr. Rastatter administered a battery of tests to Plaintiff and his report provides detailed information concerning Plaintiff's performance and Dr. Rastatter's contemporaneous observations, findings and ultimate conclusion that Plaintiff "would not be able to perform successfully in any employment situation on a regular and/or part-time basis."  (TR. 333).

The SSA obtained two consultative examinations concerning Plaintiff's mental impairment. (TR. 273-76 (Dr. Sanchez); TR. 254-58 (Dr. Yost)).  Both doctors administered the mini-mental status examination on which Plaintiff missed one or two questions out of 30.  (TR. 255, 274).  Dr. Sanchez also administered other testing during which Plaintiff performed relatively well, but for his inability to remember the word apple after a delay of time.  (*See* TR. 274-75).  Dr. Sanchez noted that Plaintiff was "mentally confused resulting in feeling overwhelmed and having difficulties with decision making."  (TR. 274).  Dr. Yost

assessed a GAF score of 50 to 55 signifying moderate symptoms or moderate difficulty in social or occupational functioning. (TR. 256; *see also supra* at n.4). Both examining doctors concluded that Plaintiff's mental condition would not impose any limitations for 12 months. (TR. 276, 258). In addition, two non-examining doctors concluded that Plaintiff's mental impairment was not severe, caused no restrictions of daily living and only mild difficulties in maintaining social functioning and maintaining concentration, persistence, or pace. (TR. 240-53 (Dr. Estes); TR. 259-72 (Dr. Goldberg)).

The ALJ found that Plaintiff had "the following severe combination of impairments: status post gunshot wound to right leg with amputations times two...[and] depression." (TR. 45). With regard to Plaintiff's mental impairment, the ALJ gave significant weight to Dr. Estes' opinion. (TR. 48). The ALJ specifically found that Plaintiff had "no restrictions in daily living activities, mild difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence, or pace." (TR. 46-47). Although the ALJ found Plaintiff's mental impairment was not severe,[14] he stated that he did "consider the effect of this impairment in reaching the disability decision." (TR. 47).

Defendant provides a plethora of reasons why this Court may discount Dr. Rastatter's report. Among those reasons are that Plaintiff exaggerated his symptoms with regard to his foot injury (*See* TR. 48), and Plaintiff regularly engaged in activities that required reaching, handling, and fingering and sustained concentration. (Defendant's Opp., at p. 13). Defendant also cites to medical evidence which he contends contradicts Dr. Rastatter's findings and ultimate conclusions. However, even though Dr. Rastatter's opinions are not those of an acceptable medical source, they are nonetheless competent evidence. *See Nguyen v. Chater,* 100 F.3d 1462, 1467 (9th Cir. 1996). Dr. Rastatter's opinions are material to the issue of how Plaintiff's alleged impairments may affect his ability to work. The information contained in Dr. Rastatter's report is not cumulative of other evidence in the record. Dr.

---

[14]Although the ALJ stated that Plaintiff's mental impairment was not severe, he did find that the combination of Plaintiff's right leg injury and depression constituted severe impairments under the regulations. (TR. 45).

Rastatter's report does not merely incorporate evidence that the ALJ previously considered, but instead reports results of tests not conducted by other sources and contains Dr. Rastatter's findings and opinions based on such results. Although the testing[15] performed by Dr. Rastatter does not elevate his opinion beyond that of a lay witness, Dr. Rastatter's opinion nonetheless requires interpretation and analysis in light of the entire record. That is the function of the ALJ. Under these circumstances, this Court is not in a position to supply reasons in the first instance to discount Dr. Rastatter's findings. *See Connett,* 340 F.3d at 874 ("[W]e cannot rely on independent findings of the district court. We are constrained to review the reasons the ALJ asserts.").

The ALJ's decision constitutes the final decision of the Commissioner in Plaintiff's case. On the instant record, the Court must assess that decision in light of the evidence, *i.e.*, Dr. Rastatter's report, submitted to the Appeals Council. *See e.g. Lingenfelter,* 504 F.3d at 1030 n.2; *Harmon,* 211 F.3d at 1180; *Ramirez,* 8 F.3d at 1452. However, because the ALJ did not consider Dr. Rastatter's report, there is no basis from that decision to determine whether Dr. Rastatter's opinion was given its proper effect. "[L]ay witness testimony as to a claimant's symptoms or how an impairment affects ability to work *is* competent evidence...and therefore cannot be disregarded without comment." *Nguyen,* 100 F.3d at 1467 (citations omitted). On the instant record, the final decision of the Commissioner is legally erroneous with regard to Dr. Rastatter's opinion.

Defendant argues that any error regarding consideration of Dr. Rastatter's report is harmless. The Ninth Circuit has "held...that 'where the ALJ's error lies in a failure to properly discuss competent lay testimony favorable to the claimant, a reviewing court cannot consider the error harmless unless it can confidently conclude that no reasonable ALJ, when fully crediting the testimony, could have reached a different disability determination.'" *Robbins v. Social Security Administration,* 466 F.3d 880, 885 (9th Cir. 2005) (noting that the

---

[15]The regulations discuss the qualifications necessary for the source administering the tests. *See e.g.,* 20 C.F.R. pt. 404, subpt. P, App. 1 § 1200(D)(5)-(9).

Ninth Circuit has never found harmless, silent disregard of lay testimony about how an impairment limits a claimant's ability to work) (*citing Stout v. Commissioner,* 454 F.3d 1050, 1056) (9th Cir. 2006)).

In making his determination that Plaintiff was unable to return to past work but could perform other work, the ALJ made clear that he considered the combination of Plaintiff's mental and physical impairments. It is not clear from the hypothetical questions posed at the hearing or from the ALJ's decision how or to what extent he considered Plaintiff's mental impairment when arriving at the conclusion that Plaintiff could perform work as a production assembler. Dr. Rastatter's detailed opinion addresses Plaintiff's ability to work in light of his impairments. Based on his observations and interpretations of test results, Dr. Rastatter opined that Plaintiff "would not be able to perform successfully in any employment situation on a regular and/or part-time basis." (TR. 332-33).

Clearly, the determination of whether a claimant meets the statutory definition of disability is a legal conclusion reserved to the Commissioner. *See* 20 C.F.R. § 404.1527(e); *see also Nguyen,* 100 F.3d at 1457 (medical diagnoses are beyond the competence of lay witnesses). Nonetheless, this Court cannot confidently say that, fully crediting Dr. Rastatter's lay opinion, the ALJ would have arrived at the same RFC determination and/or the same ultimate disability determination. *See id.* ("lay witness testimony as to a claimant's symptoms or how an impairment affects ability to work *is* competent evidence..."). The error is not harmless. This matter must be remanded to the Commissioner for proper evaluation of Dr. Rastatter's report and its effect on Plaintiff's claim and reconsideration of the denial of benefits. *See e.g. Harmon,* 211 F.3d at 1180 (remanding for further proceedings in light of, *inter alia,* evidence presented to for the first time to the Appeals Council).

As to Plaintiff's request for remand for "additional mental consultative evaluation...to comment on the test results provided by the D[isability] A[ssessment] R[esearch] C[linic]..." (Reply, p.1), the relief Plaintiff is requesting is not entirely clear. It appears that Plaintiff wishes to have an acceptable medical source comment on Dr. Rastatter's test results. Plaintiff has cited no authority empowering the Court to remand with directions for such

1 evaluation and the Court is not inclined to enter such an order in this case.[16]

2 **IV.    CONCLUSION**

3     For the foregoing reasons, remand is necessary for further proceedings with regard

4 to Dr. Rastatter's report as discussed within the body of this Order.  Accordingly,

5     IT IS ORDERED that the Commissioner's final decision in this matter is

6 REMANDED for proper evaluation of Dr. Rastatter's report and its effect on Plaintiff's

7 claim and reconsideration of the denial of benefits.  The Clerk of Court is instructed to enter

8 judgment accordingly and close this case.

9     DATED this 30th day of June, 2010.

10

11     _____

12                Héctor C. Estrada
            United States Magistrate Judge

13

14

15

16

17

18

19

20

21

22

23

24

25 _____

26     [16]The parties should not read this Order as forbidding such evaluation if, upon remand,
the ALJ deems it appropriate. Upon remand, the Commissioner may hold further hearings
27 and receive additional evidence.  *See McAllister v. Sullivan,* 888 F.2d 599, 604 (9th Cir.
28 1989).